We will hear argument first this morning in Case 24-249, A. J. T. v. Osseo Area Schools. Mr. Martinez. Mr. Chief Justice, and may it please the Court, the District has conceded Ava's question presented. Both sides now agree that the ADA and the Rehabilitation Act apply the same legal standards to all plaintiffs, and that it's wrong to impose any sort of uniquely stringent test on children facing discrimination at school. That concession fully resolves this case. The Eighth Circuit rejected Ava's claims under Monaghan's two-tiered asymmetric approach. That ruling can't stand. The District wants to preserve its victory under a new theory it invented after dropping the indefensible two-tiered approach it defended below. Now they say that the statutes apply a bad faith or gross misjudgment test to all plaintiffs, not just school children protected by the IDEA. That's exactly the opposite of what they told you at the search stage, where they said that no bad faith or intent is required outside the IDEA context. The District's new theory violates the text, history, and purpose of both statutes. It contradicts decades of regulations. It defies at least five precedents of this Court and decisions from virtually every circuit. It would also revolutionize disability law, stripping protections from vulnerable victims and gutting the reasonable accommodations needed for equal opportunity. If you address this new argument, you should reject it out of hand. But you shouldn't address it, because it's so clearly procedurally barred many times over. Whether you look at this through the lens of judicial estoppel or waiver or Rules 15 and 24, one thing is clear. The District can't win this case based on a radical new theory that goes beyond Ava's question presented and directly contradicts what they told the lower courts and this Court at the search stage. Instead, you should follow regular order and procedure, you should answer the limited question presented, and you should vacate the decision below. I welcome the Court's questions. Isn't there an argument, though, that we should, that some would think is embedded or included in the question presented, and that is, what is the standard? I don't think so, Your Honor. I don't think that question is embedded in the question presented. I think our question presented was very clear that we were asking whether the uniquely stringent test that Monaghan required only in the educational context, whether that was the correct rule. And that's clear not just from the framing of the question presented and the paragraphs, the introductory paragraphs leading into it, but also from what we said in the rest of the petition, where we used that uniquely stringent phase 10 different times to talk about what issue we were putting before the Court. We said that on pages 2, 3, 15, 13, 16, 22, 24, 27, and 39. It's not just us, though. We understood our question presented that way. The other side also understood it the same way. So when they responded to our petition and they responded to our question presented in their cert papers, they took the case on exactly those terms. They argued about the circuit split. They argued about the merits. They said this case was narrow and was only going to affect a sliver of plaintiffs who were in Ava's position, children facing discrimination at school. Now, though, they're trying to make this case about everyone, about 44 million Americans with disabilities who are protected by reasonable accommodations and who would suffer under the bad faith and gross misjudgment test that they're putting before the Court for the first time. Well, if that's true, counsel, then nobody is defending the position that you challenged. Is that right? I think at this point the other side has conceded that that position is indefensible, and therefore they aren't defending it. I think they have one amicus who filed a brief that seems to be defending the Monaghan test. Well, and yet that position that you're attacking was the majority position, right? That was the position adopted by five circuit courts. That's right. Well, what do we normally do in a situation like that? Normally we appoint an amicus to defend the judgment below. And we're saying we should just hand you a victory even though no one's challenging your understanding of what the conflict was about. Your Honor, I think that it's fully presented to this Court the issue of whether that Monaghan test is right, and the fact that the other side couldn't even come up with an argument at the merit stage to defend that standard is the reason why you should set that standard aside. It's not a reason to kind of have a do-over or appoint an amicus. I think it's true you sometimes do appoint an amicus in that circumstance. I think you usually do it when the other side is no longer defending the judgment as opposed to the reasoning of the opinion. So I don't think that that sort of situation applies here. But we certainly don't think there's an impediment to you coming in and resolving the question presented. You, of course, can look at the Eighth Circuit's rationale and the rationale of the four other circuits that have adopted this erroneous rule. If we do what you say and say that there's no unique standard in the school's context, it'll still be open to the court on remand to decide which standard is appropriate throughout, correct? I think that the Eighth Circuit would have to apply its own precedent to that question. Or it could rethink that precedent. In other words, you're saying to leave open the question of whether the proper standard is deliberate indifference or instead is bad faith or gross misjudgment and that that can be considered on remand and can be considered by other courts of appeals to the Chief Justice's question that have this carve-out or separate rule for schools. I think in theory it could be considered on remand either by the Eighth Circuit or in other cases by other courts. I do think that in this case it can't because in this case we think the other side is judicially stopped from changing positions on which they successfully avoided on bonk review in the Eighth Circuit. Point taken on that. And then can you explain the delta between, on the one hand, deliberate indifference, at least as the Solicitor General defines it, and bad faith or gross misjudgment, on the other hand? Because the way they define deliberate indifference sounds a lot like someone acting in bad faith. Your Honor, can I just add one additional comment on your earlier question and then answer that one? I think the other thing is when we're asking you to get rid of the Monaghan two-tiered approach, I think it would be valuable and important for you to say not only that that approach is wrong but that the rationale under which it was adopted, the rationale being that the IDEA context requires this sort of special rule in this context is wrong. And I think that would help provide guidance to the Eighth Circuit and other courts. With respect to what the test is, you know, it's a little hard to fully understand the other side's test because they've characterized it in so many different ways that kind of seem to flip-flop depending on what court they're in and what brief they're writing. As I understand their current theory— No, just put aside what they're—what is the difference between deliberate indifference and bad faith? So I think their—as I understand their bad faith test, it requires motive, which in their brief they describe in various places as requiring a sinister state of mind or something, you know, approximating a bare desire to harm. And so I think that's an animist-type test that requires more than the knowledge that there's a substantial likelihood— Deliberate indifference, as the Solicitor General at least is articulating it, and I don't know if you agree or disagree, you would have to know that you have a legal obligation to do something or substantially likely and still not act. So I think— And if you know you're supposed to do something as a matter of law and don't act, that's, you know, that sounds like bad faith. I think you can ask the Solicitor General to elaborate on their theory. As I understand their test, which we think is the majority test, you don't have to know the law. You don't—a mistake of law is not a defense. You have to know the facts that would constitute a violation of the law, and then you have to be indifferent to those facts. And I think it's a fair question to ask the SG what they—how they would characterize it, but that's certainly how I understand the test. I'm not sure where any of these tests come from, because mens rea is generally willfulness, which requires knowing what the law is, but the statute doesn't talk about willfulness. Motive, intent, we don't care about motive. We've said that repeatedly in a bunch of different contexts. It's do you know you're doing the act, and are you intending to do the act? If it violates the law, you're guilty. Pardon the pun. This is a tort, but you're responsible. Or you do it knowingly, knowing that you're doing the act. So I don't know where the bad faith comes from. I don't know where the gross indifference comes from. I don't know where the deliberate indifference comes from. Have you figured that out? And I think that that's part of the question that would have to happen if a court takes the other side's point that it should be intentional with respect to all claims, injunctive and or damages. So I take their point that maybe you need intentional conduct for an injunction, but I don't really know why you need anything else.  Justice Sotomayor, we agree with that, the impulse underlying that question. I think those are some great questions for the other side. I think what I would say on this is that- Yeah, but you're here. Well, let me take a shot at it. I think certainly with respect to liability and whether the statute is violated, there's no intent requirement. It's not in the statute. What the statute has is a causation requirement, which is satisfied in circumstances where a person's disability means that they're being excluded from a building or a program or a service. So there's just no way to gin up an intent requirement out of that. I think what some courts have done in the context of damages is they've sort of read the damages provisions and the remedies that are available through the lens of the spending clause and said we require something more. And because we require actual notice to the recipient of federal funds before we cut off federal funds, we should require some form of notice. And so in the Title IX context, courts have applied a deliberate indifference-type standard. And we think that that's sort of the uniform rule, or at least the almost uniform rule that's applied by nine circuits in this context. What the other side has, though, is a bad faith and gross misjudgment rule that is literally-it comes out of nowhere, like nowhere. No court has ever embraced that test as a standard other than the five circuits that we're arguing about here. No court has ever embraced that test in any other context under the discrimination laws. And we think that's a very high standard. I think you're going too far, though. Meaning I don't know why you can't have an intentional failure to reasonably accommodate. Because that's what discrimination is. And accommodation is I'm not letting you use a program that you're otherwise qualified for because I'm not letting you get to the program. Either you're not providing a ramp or you're not providing an instrument that I could use. By its own definition, that's intentional conduct, isn't it? Well, I don't think so, Your Honor. I think the reasonable accommodation problem arises in a context where there's no intent. And I totally agree with what the other side said on page 30 of their brief in opposition and what this court said in the Choate decision, where it recognized that the statutes provide and this is page 30 on their brief, statutes prescribe at least some unintentional yet harmful conduct and talked about Choate, which itself recognized that the Rehabilitation Act targets unintentional discriminatory acts like architectural barriers. So those do not require intent. They've never been understood. Mr. Martinez? Mr. Martinez, I'm sorry. Just to follow up on that, I take your point that we don't have to address any of this on your theory of the case. But deliberate indifference is often deliberately indifferent to somebody else's discrimination. It's usually a supervisory type liability. And as Justice Sotomayor suggested, and maybe I dismissed it, when we think of discrimination in many contexts, causation, you're right, but the act of discrimination is to treat someone else differently because of their disability, right? And I would have thought that that might have meant I intend to treat someone differently. It doesn't matter about my further motive. I agree. I take that point, bad faith. But why wouldn't that be the test? So, Your Honor, two things on that. First of all, I guess what I would say is with respect to the need for intent in every context, what actually helped this whole area block click for me was reading your decision in the Cinnamon Hills case, which was addressing, explaining sort of the theory of reasonable accommodation. I'm glad you remembered that because I'm not sure I do. It was actually a very thoughtful opinion that really kind of teased out the differences between intentional treatment and reasonable accommodation claims. And what you said in that opinion was that sometimes formal equality isn't enough. And in the disability context, it isn't. And the reason for that is that you can have people discriminated and excluded by reason of their disability, even though there's no intent. And so because you have a disability, you're not able to take advantage of a program. And so even when there's not animus, when there's not a bad actor on the other side, you know, imagine someone rolls up. I follow you. I got it. Thank you. That's helpful to me. And thank you for the reminder. I do have one other question. Yes. And that is, you're right, that a lot of the courts have looked at these things through the spending clause, really the spending power, and therefore states have to be on clear notice. And they distinguish between damages and injunctions on that basis. But I'm kind of curious why, because I would have thought in a contract scenario, I might be more on notice that my violations would incur damages than they would an injunction requiring specific performance, which is an unusual remedy for a contract breach. Thoughts? So I think on that one, I think that with respect to the injunction, if the recipient of federal funding doesn't like the injunction, they can just stop receiving the funding so they have the ability to get out of the deal. And so it doesn't put them on the hook to spend money in the same way that damages remedy would. Mr. Martinez, has any other circuit taken the view, or is this argument that the other side is pressing, is that one that's kind of a live issue in the lower courts? No. Any other court taken it? No. We have 12 circuits. Every single geographic circuit across the country says that you don't have to show intent to establish a violation of this statute outside of the context of children with education claims. So the baseline rule that applies everywhere is no intent for liability. You then have 10 circuits that have said you do have some form of intent requirement for damages, and nine of those 10 circuits say that the test is deliberate indifference. There's a little bit of uncertainty about the Fifth Circuit about what kind of intent is required. The Fifth Circuit has suggested that deliberate indifference might not be enough, but they haven't really clearly adopted a different intent standard. But I think the other side says that there would be disarray if you didn't resolve, like, every last issue in this case. That's just not right. If you say the IDEA context doesn't create a special rule disfavoring kids in the education context, what's almost certainly going to happen is that the circuits out there are just going to apply their baseline rule, and all 12 of the geographic circuits are going to say that intent isn't required. Well, it might also be that this sparks percolation on this issue. I mean, maybe what will happen is that there will be pushback of this sort, but your friend on the other side is advocating. I would doubt that because of the fact that the reason these five courts have applied this Monaghan test is really because, and as they explained it very well in their brief in opposition, it's all about the IDEA. I mean, look at their brief in opposition. The first paragraph is all about, like, this is an IDEA case, and they're basically trying to interpret these statutes in circumstances where kids have protections under the IDEA to give them fewer protections under the ADA and Rehabilitation Act. I understand, Mr. Martinez, why they did that before Smith v. Robinson and the congressional response to that. It's basically the same rationale that the court used in Smith v. Robinson, but once that happened, Smith v. Robinson and then Congress's repudiation of it, why didn't those courts go back and take a look at their own precedent? So Monaghan was, of course, before Smith v. Robinson. I don't know the answer to that, Your Honor. I think it's hard because you have to get en banc review. We tried our best to get en banc review in this case, and when we did that, and we surfaced this issue to the Eighth Circuit in an effort to get them to overturn their precedent, the other side came in and said they didn't just say follow this because it's your precedent. They said follow it because it's right. And they won a denial of en banc review in part based on their argument that there is this two-tiered approach and a special rule needs to apply with kids who have IDEA rights. And so now they're coming into this court flip-flopping on that and trying to kind of have it both ways and play both sides, even though now they realize that that earlier argument is indefensible. Mr. Martinez, can you just speak very clearly? Chief, can I go forward? Sure. Chief, can you just speak very clearly to why they're wrong about that? In other words, they said Monahan is correct for this particular context. And I'd invite you to just tell us why they're wrong. I think there are two main reasons, which I'll summarize very quickly. Number one, there's nothing in the text of either the ADA or the Rehabilitation Act or the statutes at cross-references that sets up a two-tiered standard under which different plaintiffs seeking relief under the same provisions have different standards apply to them. If that weren't enough, we think it is enough, you have an express statutory language, 1415L, in the IDEA that was enacted to overturn Smith v. Robinson and the erroneous reasoning that it embraced. And 1415L specifically says, I'm not going to quote it, but it says that you can't use the IDEA to limit people's rights under the other statutes like the ADA or the Rehabilitation Act. Thank you, counsel. Justice Thomas? Justice Alito? This is not exactly related to the question that's before us, so perhaps it's unfair, but I think it might have some relationship to what the court below was getting at. So this is the question. What difference, if any, do you see between the cost that a school district must be required to the extra cost a school district must be required to shoulder under the IDEA and the extra cost that would constitute a reasonable accommodation under the ADA or the Rehabilitation Act? I think it's going to depend in any particular case. And the way to think about this is these are really different statutory regimes. You have the IDEA that gives you an affirmative right to a FAPE, the ADA and Section 504, which eliminate discrimination. Depending on the case, it may be that the IDEA gives you more than the other statutes in one context and the other statutes might give you more than the IDEA in a different context. Here, I think with respect to the monetary relief that's at issue, the statutes overlap to some extent, but they don't overlap with respect to the statute of limitations. And so we're trying to take advantage of the statute of limitations that Congress gave us with respect to the ADA and the Rehabilitation Act, which allows us to go back further in time than the two-year statute of limitations under the IDEA. Thank you. Justice Sotomayor? Thank you. Justice Gorsuch? Justice Kavanaugh? A couple of follow-ups. You agree that there's an intent requirement for damages claims, but you say it's deliberate indifference, correct? Your Honor, in our opening brief, we did not take a position on that. We did not take a position on whether there was an intent requirement, but we certainly are not fighting that. We didn't fight that below. I think the Eighth Circuit and nine other circuits say it's deliberate indifference. That sounds close to a yes. Close to a yes. You know, we would have taken a position on it if we thought that was the question presented, but it isn't, so we didn't have to. But I think that's fair. Do you agree with the SG's formulation of deliberate indifference? Any problems with how they formulated it in their brief? As I understand their formulation, I agree with it. I think substantial likelihood is an appropriate way of thinking about, you know, substantial likelihood of a violation. I think the one thing I just want to be very clear on is you don't have to know the law. You have to know the facts that would give rise to the violation, and I think that's an important caveat. Well, on that point, in my last question, there's a lot of line drawing that has to go on in this context, I think, with school districts deciding whether to provide services to 430 p.m. or until 6 p.m., and that's a very fact-intensive judgment on which the district court found that the district officials exercised professional judgment, convened multiple IDP meetings, extended the school day beyond the school day of their peers, implemented many of Dr. Reichel's suggestions. Failure to provide extended schooling until 6 p.m. at home was at most negligent, is what the district court found, and I guess it's hard to know how you say where you find a line for deliberate indifference or you know that it's substantially likely to be a violation when it's this fact-intensive reasonableness kind of inquiry. So how should a court think about that? In other words, the court on remand, if it's applying deliberate indifference, how should it think about it as related to these facts? Well, I think the first thing I would say is we love the fact that we have appellate courts, and the Eighth Circuit in this case said, looking at those same facts, that we may well have established deliberate indifference. So it took a different view. We think certainly on the summary judgment record in this case, we would get past the other side's motion for summary judgment on whether there was deliberate indifference. Obviously, it's going to be a fact-bound analysis. It's going to require close attention, and the sensitivity that this court has often said is very important in the IDEA context and should, of course, apply in this context, too. But we think that we have good arguments and good facts for us that we can prevail on deliberate indifference properly understood if this goes back down below. Thank you. Justice Barrett? Justice Jackson? And, of course, your overall point is that courts already consider deliberate indifference on facts in other contexts. That's right. They consider it on other facts in other contexts, and Justice Gorsuch asked, isn't it only the case when you're talking about supervisory-type liability? And I would just say, I should have said this earlier, Justice Gorsuch, but I'll say it's also true in other contexts, like the prison context. When you're assessing Eighth Amendment claims, dealing with medical treatment or conditions of confinement, and you're looking at the prison's own conduct, you apply the deliberate indifference standard there. And so, yes. Thank you. Thank you, counsel. Ms. Reeves? Mr. Chief Justice, and may it please the Court, there is no sound basis for applying different intent requirements to Title II and Section 504 claims brought in the school context. The text of those provisions apply to qualified individuals and provide relief to any person and do not distinguish among different contexts. And if there were any doubts, 20 U.S.C. 1415L makes clear that Title II and Section 504 rights are not restricted or limited in the education context. Respondents no longer dispute these points. Instead, they ask this Court to adopt a breathtakingly broad rule and hold that a plaintiff cannot bring a Title II or Section 504 claim in any context without proving intent to discriminate. No court of appeals has ever adopted that rule, which would entirely eliminate all Title II and Section 504 reasonable accommodation claims. This Court should reject respondents' attempt to belatedly insert such wide-ranging issues into this case and instead merely hold that students are not required to satisfy heightened intent standards in the school context. And respondents' arguments are wrong on the merits in any event. The text, context, history, and purpose of Title II and Section 504 do not require a plaintiff to prove intent to discriminate to bring a claim. I welcome the Court's questions. So, I think you argue that intent is required in the damages context? Yes, Justice Thomas. But not injunctive relief? Yes. Now, what's your explanation for the difference? So, I think the explanation comes primarily from this Court's recognition in the spending clause context, and particularly in Davis and Gebster, where the Court has walked down a lot of this road, that there needs to be particular notice when there's going to be an expenditure of funds under spending clause statutes. And, in contrast, when an entity incurs liability but is only potentially going to have to be on the hook for injunctive relief, the entity has a choice. They can reject ongoing spending in exchange for not having continuing injunctive relief. And that's not the case with backward-looking damages. And I think it's also not unusual for the Court to draw these types of lines in this area. In Lane v. Pena, the Court held that the Rehabilitation Act, in Section 504 in particular, that the United States had not waived its sovereign immunity with regard to damages claims, but recognized that it had waived its sovereign immunity with regard to injunctive relief claims. Well, I get the sovereign immunity overlay, but the strength of the argument from petitioners and the government is that the statutes here don't draw any distinction of the sort that the respondent proposed below. And here you're asking us to draw a distinction that the statute doesn't have on its face between damages and injunctive relief and apply a higher standard when it comes to injunctive relief. So could you address that oddity? And then, again, I ask the question of Mr. Martinez. If you're looking at it through a contract-type lens, through the spending clause, why wouldn't a state be on notice more that a breach would incur damages than specific performance, which is an extraordinary remedy in contract, at least? So one might think if the state were on notice of anything, it might be injunctions before damages rather than the other way around. Thoughts? That's the first part of your question. I don't think we're asking the Court to draw a new line here because I think both Gebser and Davis already strongly suggest this line between damages and injunctive relief. Well, textually, I understand that point. But I was focusing on the statutory text. The strength of the argument here is the statute doesn't draw the distinction that the respondent proposed. And now you're asking us to do a similar thing, and I'm just wondering about its consistency with contract-type analogies. Right, and so as far as the contract analogy goes, I think that the contract analogy obviously isn't perfect because the focus here is notice as to liability going forward. And if you've already had a violation of the statute and you're automatically liable without any sort of intent requirement, that would raise real notice problems. But unlike a traditional contract, a state can't, or a fed-funded entity can withdraw to forego ongoing injunctive relief. That's not necessarily true of a contract, but I think because of the way the spending clause contract overlay works in this context, the notice concerns are just less there. And I would also like to just briefly respond to respondent's suggestion that injunctive relief is always going to be significantly more burdensome. Plaintiffs still is going to need to prove both the violation and that they are entitled to injunctive relief. And that means they're going to need to show that the violation is ongoing and that but for injunctive relief, the violation is not going to fall. Does the government think that intent is required or that it's just noticing that it might be suggested by our cases? Or would deliberate difference be the appropriate standard for both damages and injunctive relief? So we think that, and I think this is consistent with what we said in our brief, intent is not required to state a violation of the statute. No, I understand, but for damages. And it is not required for damages. It absolutely is required for damages. But your argument doesn't turn on that today, right? I'm trying to understand whether to rule in favor of petitioner or the government today, we have to take a position on deliberate indifference or whether there's a difference between damages or injunctive relief. I didn't understand the question presented in this case as it currently exists to require us to rule on any of that. That's correct. We don't think the court has to rule on any of that because we do think this was teed up on the assumption that there are baseline standards. The court doesn't need to get into those. And the question is just whether there's a heightened intent standard that applies to all claims in the school context. In that regard, do you have any concerns that no one is here defending the position of the majority of circuits who addressed this question below, or am I the only one? Mr. Chief Justice, I don't have any concerns about that. I do think you have the reasoning of the decision below, you have the reasoning of Monaghan, you have the reasoning of one of the amicus briefs in support of respondents. You have respondents' brief in opposition, which actually did take this head-on. And I honestly don't think there's a lot more to be said for the bad faith or gross misjudgment standard. There's no basis for it in the text, particularly in light of Section 1415L. And I think there's perhaps a reason that respondents have shifted positions because it is so hard to defend. So I don't think this is a situation in which there's a close question that this court should be worried about that no one is actually defending. Why do you think no circuit has changed its position? If it's so obvious that a respondent has just completely given it up and jumped overboard, why are all these circuits sticking with it? I honestly think that's a good question. Having read all of these cases post-Monaghan and then post-Section 1415L, it really just seems like courts of appeals haven't grappled with it. And maybe it's because of how some of these cases were litigated and 1415L wasn't pointed out to the courts. I do find it somewhat surprising, but I don't think that's a reason for the court to suggest that the bad faith or gross misjudgment heightened standard is appropriate. Can I ask you the question that the government always gets asked, the difference between your position and Mr. Martinez's? I think the primary difference is that while we don't think the court has to resolve this in this case, we absolutely believe that intent is required for damages claims under the ADA and Title in Section 504, and we think that deliberate indifference is a way to prove that intent. And I think I took my friend to not be taking a clear position on that here or in his briefing. How would you describe the difference between deliberate indifference and bad faith? So I'd like to take this in a couple parts, both as to the whole standard and then each part of the bad faith or gross misjudgment standard. So deliberate indifference requires actual knowledge of that a federally protected right was substantially likely to be violated and failure to act. That we think is just a standard intent requirement. It doesn't require any sort of animus. So look at the bad faith or gross misjudgment standard. I think, first of all, as a whole, it's been rarely applied. It's only been applied in this Monaghan line of cases. And for that reason, I think it's a little bit under-theorized, whereas deliberate indifference has been applied across the board to Title II and Section 504 cases other than subcircuits in this context. And then if you break out the two parts of the standard, I think that bad faith appears to have an animus requirement, which we just don't think is consistent with the text of these statutes. It's not consistent with things the court has said in cases like Murray v. UBF securities that discrimination generally doesn't require animus. So we think that's too high of a standard. And then if you get to the gross misjudgment part, I think that's very unclear. Respondents suggested in their brief in opposition that just looking at it on its face, it doesn't require intent at all, and that would be a problem. And then respondents in their merits brief cite two cases that are over 100 years old that don't even use gross misjudgment. They use gross mistakes. The Justice Barrett's question about the circuits, is there a case out there that failed under the bad faith standard that you think would have succeeded under the deliberate indifference standard? Well, the court of appeals below here thought that it probably made a difference. So I think that's a good example. I think I can give you an example of a case sort of going the opposite direction. So we cite the 11th Circuit's decision in lease in our briefing. And in that case, the issue was whether there was failure to provide a reasonable combination in the form of a sign language interpreter for a patient at a hospital. And the court found that there was enough to go to trial because there was deliberate indifference, because these individuals have repeatedly requested an interpreter. But there was no indication in that decision that any of those choices made by the hospital were backed by some sort of animus on behalf of animus discriminating against individuals with disabilities. So I think that case, while it got to go to trial under our standard, wouldn't necessarily get to go to trial under the respondent. Thank you, counsel. Justice Thomas, Justice Alito. What do you think was the impulse that led so many lower courts to adopt the standard that you find to be completely unsupported? So I think the initial rationale was the one the court laid out in Monaghan, the 8th Circuit laid out, which was this desire to harmonize the IDEA with Section 504 and Title II. And I think that might have been understandable, but obviously this court found that logic compelling and smith. But I think once Congress adopted 1415L and said that nothing in the IDEA shall be construed to restrict or limit the rights, procedures, and remedies available under the ADA or Rehabilitation Act, it was just abundantly clear that that harmonization is inappropriate. I think there also might have been a little bit of a misunderstanding about some of the daylight between these type of claims. I mean, my friend laid out very well, I think, that different protections under the IDEA and Title II and Section 504, but there are some claims you just can't bring under the IDEA. So if an individual is on grade and they don't need any special education, they're not going to get anything under the IDEA. But if they're using a wheelchair, they are going to potentially need a reasonable accommodation under the IDEA. But don't these two statutes proceed along very different lines? Under the IDEA, the school district must provide a free, appropriate public education. That can be extremely expensive, right? Yes. The anti-discrimination statutes, the ADA, and the Rehabilitation Act start from the baseline that people with disabilities are supposed to be treated the same as people without disabilities. But they depart from the baseline because employers, for example, in the employment context, must make a reasonable accommodation. But there's a limit to the expense that an employer, for example, is required to bear under the ADA. So is there a substantial difference in that respect between the financial burden that these two statutes impose on the regulated parties? No, I don't think so because the reasonable accommodation limitation, and particularly the reasonable part of that, is baked into both Title II and Section 504. That's been recognized since the 1970s, shortly after the Rehabilitation Act was adopted. And then Congress, when it enacted the ADA, said in Section 1201A that nothing in the ADA shall be construed to apply a lesser standard than the standards applied under Title V of the Rehabilitation Act or the regulations issued by federal agencies pursuant to such titles. So the reasonable accommodation limitation is baked into these Title II claims that can be brought against public schools. And so the public school is going to be able to come forward and say, this is not reasonable because we can't afford it, because it's not the sort of thing that is normal accommodation, or because it would require fundamental alteration in the programs that we give to students. Well, let me just give you one other example. I don't want to belabor this too much because it's a side point. Suppose an employer... a place of employment is open from 9 to 5. Let's say it's a store. For some reason, it's open from... closes at 5 p.m. And there's an employee with a disability similar to AJT's disability here who can't work in the morning but could work later in the day. Would that employer be required under the ADA to allow this employee to work after closing time instead of during the normal hours when this business is providing a service to the public? No, because under the reasonable accommodation framework, the employer would be able to say, well, this isn't a sort of accommodation that's reasonable on its face or used in a variety of cases. This isn't a sort of accommodation we've seen before, and that's a defense courts often recognize. And then they'd also say, well, this would be a fundamental alteration to our business. I think, Justice Leder, one thing I would just point out is I actually think that underscores some of the differences between the IDA and Title II and Section 504 in the education context. You know, we have not taken a position on this, but just because after-hours education is required under the IDA does not mean that that's a required reasonable accommodation under Title II and Section 504. All right, that's what I was asking about. Thank you. Justice Sotomayor? Justice Kagan? Ms. Reeves, if we decide that this dual-track approach is incorrect and if we say nothing about the appropriate standards with respect to either damages or injunctions, what's your understanding of what could properly happen below? So I think below, without any other urging, presumably the Eighth Circuit would apply its general precedent to those two questions, and the Eighth Circuit has generally held that the state of violation of Title II or Section 504, you don't have to prove an intent. That's also true for injunctive release, but the plaintiff would have to prove deliberate indifference for damages. We haven't taken a position on whether, you know, respondents could try to raise these broader arguments on remand. I think there are some good arguments that those have been forfeited and that there are judicial estoppels, but that would obviously be a question for the lower courts to sort out. And you said without any urging on our part or without any encouragement. I mean, is there an argument for encouragement? Is there a better approach not to do that? Do you have a position on that? We don't think that there's any basis for courts to start reconsidering the reasonable accommodations framework that all courts of appeals have signed off on. I mean, this court has recognized it since the mid-1970s. The entirety of the Rehabilitation Act and Title II have been built up around that. And so I don't think there's a good basis for that, and there wouldn't be any reason to encourage it. Thank you. Orsic, Justice Kavanaugh? You said that clear notice was important, I think, in this context in damages claims. And the other side says that your framing of deliberate indifference, in particular actual knowledge that a federally protected right was substantially likely to be violated, they focus on substantially likely, that that does not give, in this context, school districts clear notice of what they have to do, in particular something like this, 4.30 p.m. or 6.00 p.m., and that it's, therefore, and you're talking about reasonable accommodations and line drawing to Justice Alito's question. How do we deal with that? Well, as an initial matter, I think the deliberate indifference standard is significantly clearer and gives more notice than the proposed bad faith or gross misjudgment standard, where we don't even know if the second component requires intent or not. And deliberate indifference is much more well-developed. Just on the question, though, this standard is not exactly crystal clear. At least that's what the other side says. School districts, to Justice Alito's point, are going to be on the hook for substantial expenditures, and they want just notice. Tell us whether we're substantially likely to violate the law. How are they supposed to determine that? So a couple of responses to that. So, first of all, I do think, you know, this is an actual knowledge requirement, and it is failure to act, a deliberate choice not to act. You say actual knowledge of your legal obligations, correct? So it's not actual knowledge of the law, but it's actual knowledge, and I think this is consistent with normal intent standards, that your actions are illegal, or your actions are likely to violate someone's rights. So it's not that you have to know the precision of... I mean, this is a tricky area in many areas of law, but I do think that with the substantial likelihood standard, as this Court has described it in Davis and Gebser, is going to require, you know, a more than 50% assurance that a violation is going to occur, and that means that you've kind of made a mistake as to the whole reasonable accommodation framework. And I would just point out that because we're just talking about injunctive relief, the kind of worst-case scenario here is if the entity mistakenly, you know, denies reasonable accommodation, and it turns out they should have granted it, they'll just have to grant it going forward, unless there is, you know, this high level of deliberate indifference. Like, the standard builds in the ability for school districts to make significant mistakes and not be held liable for damages. Sorry to belabor it. One last question. If a school district says, I don't know whether the counsel for the school district says, I don't know whether the law would require us to go to 6 p.m. or 4.30 p.m., I just don't know. I don't know how that will be assessed. Can a court then say that they acted with knowledge that a federal right was substantially likely to be violated? I don't think so. I think that would fall into the kind of bureaucratic inaction or negligence buckets, which are not high enough to be actual knowledge. Thank you. Justice Jackson? So, in your exchange with Justice Kavanaugh, it seemed like the intent factor or element was taking on a lot of work in terms of figuring these kinds of claims out. And I really thought that in the reasonable accommodations framework, that it's an interactive kind of engagement that when a person has a disability and they say, I need this accommodation, there's like a back and forth between the employer, the school district, or whomever. So, it's not really like a surprise coming out of nowhere, and it's all about intent. It's really, I thought, about arguments related to whether or not this particular accommodation is reasonable under the circumstances. So, I do think the bottom line inquiry is going to be intent, but I think you're absolutely right that in a school context in particular with a disabled child, there's going to often be a lot of back and forth between the school district and the student, and that may often be relevant to showing intent. And I think some of these cases that we've cited, like the lease case I cited earlier, intent there was possibly shown by the repeated request for a reasonable accommodation and failure to grant those requests. Let me just ask this. If we say there's no heightened standard here and that the regular standards apply, and let's say the Eighth Circuit has adopted deliberate indifference in this context, the ADA claim could then proceed in the sense that it's not barred because we don't have this animus. Would there be then some engagement around whether or not this particular accommodation was reasonable? Yes, I think that would be appropriate on remand. So, we obviously haven't taken a position on how this should come out. But I think what would happen on remand is as to petitioner's injunctive relief claim, the court would need to go through the analysis and see whether this was, in fact, a reasonable accommodation request that was denied. And then, if yes, whether the requirements for injunctive relief are met. And then, if yes to the liability question, would also need to go through deliberate indifference as to her request for damages. Thank you. Thank you, Counsel. Ms. Blatt. Mr. Chief Justice, and may it please the Court, this Court should affirm Monaghan. Bare IDEA violations do not support liability under Section 504 or the ADA. Instead, the defendant must have acted with discriminatory intent. Monaghan correctly described that intent as bad faith, which is the longstanding term for actions done for an improper reason. Here, disability. 504 and Title II require discrimination by reason of disability. This Court has held that the nearly identical text in Title VI requires intent to discriminate. Petitioner acknowledges that because the law here expressly incorporates Title VI rights and remedies, discriminatory intent must be shown to get damages. But petitioner departs from that intent requirement for liability and injunctions. That's wrong. When Congress wanted intent-free liability, it said so expressly. In ADA's Title I and III, Congress spelled out reasonable accommodations, intent-free claims, and barred damages without intent for employers and altogether for hotels and hot dog stands. Congress did not plausibly disfavor states and localities in Title II. This Court should decide the correct standard. The petition ends with, quote, what standard should apply under the ADA and Rehab Act is a pure question of law. It should be resolved in this case. That's a quote. We agree. And reversing Monaghan would expose 46,000 public schools to liability when for 40 years they have trained teachers, allocated budgets, and obtained insurance, all in reliance on Monaghan. Every good faith disagreement would risk liability or even the nuclear option, the loss of federal funding, which is over $100 billion. The district cares deeply about Ava and gave her more service than any other student, even before this litigation started. Such good faith efforts should not support discrimination liability. I welcome questions. Is this the same argument that you made below? Yes. So let me take you through, again, I had an out-of-body experience listening to what we argued. But in the rehearing petition on page 1, the school district argued Monaghan is required by the text. On page 26 of the brief in opposition, we said, Monaghan is required by the text. We quoted the text, and we said it requires discrimination intent. We cited Title VI. Because this statute expressly incorporates the rights and remedies of Title VI, intent was required. We cited Sandoval, which is your seminal case under Title VI, which holds the nearly identical language requires discriminatory intent. Now, to be sure, page 27's ongoing and the hearing petition and the red brief still argues, from the top of the mountain, that this standard makes particularly good sense in the school context because the other side in their complaint, and this goes directly to Justice Alito's question, on paragraphs 118 and 133, say, just because you violate the IDA, that is ipso facto a violation of the ADA and Rehabilitation Act. So we've always said that you owe deference to schools, and this standard makes sense, and I can talk about how Monaghan arrived. Monaghan makes complete sense. It's a caricature and not an accurate description of that case. It starts with the language of the statute and said, when you have a mere violation of the requirement to provide a free and appropriate education, that is not necessarily discrimination. Quote the statute solely by reason of discrimination. Something else was required. Now, the court chose bad faith for a reason. Bad faith, by definition, means an improper purpose. The only purpose that is prohibited by this statute is disability. No one, no case, no site has ever said that's animus. Again, that's made up, hence out-of-body experience. Ms. Blatt, I'm over here trying to really figure out what you argued below. Sure. And the many, many times that I understood you to be pegging your argument to the unique elements of this particular environment.  And so I think it might be a little unfair to suggest that what you were always just saying is that Monaghan is based on the text of the statute. It seems to me that you were very clearly saying, and you're right up into the opposition to rehearing and to the bio below, that there was something about the IDEA context and schools that gave Monaghan its value. Both of those statements are correct. It is not inconsistent to say Monaghan is required by the text and this makes great policy sense in the school context, which is also what Judge Arnold said in the Eighth Circuit. The disconnect is there's this, I don't know, it's a lie to say that we never defended Monaghan by the text. It's on page 26. No, no, no, I'm not. I don't think the argument is that you never defended it by the text. Well, what is a lie and what is inaccurate? No, no, no. If I could just get this out, please. What is a lie and inaccurate is that we ever said in any context that this court should take the same language and define it differently depending on context. That is not true. There is no statement. They're adding words to our mouth. We never said you should have a double regime. What the school district has said, which is what Monaghan said. Do you believe that Mr. Martinez and the Solicitor General are lying? In oral argument, yes, absolutely. It is not true that we. I think they should be more careful with your words. Okay, well, they should be more careful in mischaracterizing a position by an experienced advocate of the Supreme Court with all due respect. I'm quoting from their reply brief where they say that with citations what you said that the secondary education was a, quote, unique context, quote, giving rise to a unique subset, quote, calling for a, quote, different standard. Correct. I'm sorry. Where does it say that quoting for a different standard? That part we never said. Are they quoting? Well, they've got quote marks around it. Where's the page? It's page four of their yellow brief. I mean, we never said that there should be different standards. What we've always said and what we've acknowledged in the brief in opposition, which is true, that outside the school context, the courts have said there's no intent at least for liability but for damages. But we are where we are with the question presented. What I hear the real dispute is what does the question presented ask? And the question presented, we read, is what is the correct standard? Now, to be sure, they add the pejorative term uniquely stringent. But had the question said should this court adopt a uniquely stupid bad faith standard, the question would still not be should courts adopt uniquely stupid standards. It would be should courts adopt the bad faith standards. Ms. Black, in order to say it's uniquely stupid, I think you would have to point to at least one other circuit that has actually applied the bad faith standard in a different context. I mean, to the extent that you're now saying it's dumb for them to have adopted it or not to have adopted it everywhere, can we get to the substance of your argument? Sure. Our definition of bad faith is discriminatory intent. I understand, but has a single other standard, a circuit, applied that outside of this particular context? So, well, no in the sense of the circuits that are applying outside the school context, including the Eighth Circuit, don't apply bad faith. They apply no intent, deliberate indifference. And is your argument that bad faith should apply everywhere? Yes. The statutory text, solely by discrimination is the reason for the action, is a discriminatory intent standard. And that would be a sea change, right? That's what the other side told us? Well, it would be only a sea change in terms of liability. If we're going to talk about what the circuits, Judge Sutton said... Well, a sea change in terms of liability is a pretty big sea change. I mean, Justice Jackson's pointing out that no circuit has adopted your rules. Well, we're asking the court to decide this case. In terms of outside the school case, Judge Sutton's opinion, the Sixth Circuit, and that counts as a court, has held that this statute, just like Title IX and Title VI, requires discriminatory intent. Now, that's in the disparate impact context, and no one has had a basis for saying there's any distinction between reasonable accommodation of disparate impact. Regardless whether it's technically in the QP, it strikes me as a pretty big deal. I think that's right. So why would we do it when we don't really have... We don't have... This didn't come up until their reply, because they didn't understand it to be the QP. We don't have other circuits that have adopted the question. As I suggested to Mr. Martinez, it's possible that if we decided this case in his favor, that then when it goes back below, this argument that you're making here will be made, and then it can follow our traditional way of letting it percolate up, and then we can address it when we have more information. But this seems like a really pretty big deal. I think it's everything you said I agree with, except for the blue brief and the government's brief said that the statute requires... You have to apply the plain text. So lo and behold, we looked at the plain text. In terms of how you want to decide the case, absolutely you need to make clear that if you're just going to reverse, that the Eighth Circuit is free, notwithstanding its precedent, to either level down like the other side wants and apply the no intent, deliberate indifference outside the school context, in the side of the school context, or level up. On the level down, level up point, you're defining bad faith so it doesn't require animus. Correct. So you're, I think, lowering bad faith from what some people might think bad faith encompasses. But no one, some people, it's just this conversation. These courts have said... Some judges. They said it requires discriminatory intent. No one has said animus. Okay. I'm just making the point, you're saying bad faith does not require animus, correct?  Okay. And then the SG defines deliberate indifference to require actual knowledge that it's substantially likely that you're violating the law. And I'm wondering, bad faith as you define it, without the requirement of animus, and what they say is deliberate indifference, I'm having a little trouble seeing a case that would actually come out differently under those two things. Well, sure. And this is the problem with their deliberate indifference test. And this goes to Justice Jackson. No court, no context except the prison would ever use a deliberate indifference test for intent to discriminate. Intent to discriminate is you have to intend to discriminate. Their test is you could have no intent to discriminate. You could be obsessed with a scandal. You could have budget concerns. But you were deliberately indifferent to some undefined percentage that a student asked for extra test time and you gave 30 minutes instead of 60 minutes. Well, if you think that there's a substantial chance that 60 minutes might be it, but in good faith you want to, you know, one circuit has held 30 minutes is enough, there's damages liability. That is insane. That is not an intent to discriminate. That is just either a disagreement about what the law requires or you had some sort of weird problem that had nothing to do with a child's disability status. You just were deliberately indifferent. If you're going to follow Title VI, and this is the Fifth Circuit, the Fifth Circuit said I don't know what this deliberate indifference is. Title VI requires intent. There's no scenario where deliberate indifference has ever meant discrimination in and of itself as opposed to you're deliberately indifferent to a teacher's or student's intentional sexual harassment. We agree you could have a deliberate indifference if there was supervisory liability to discrimination against the disabled. Why do you think that's taken hold in all the circuits outside the school context? Easy. They cited this case called Monell. I mean, that's just wrong, weird mistake. So then they said, well, Davis and Gasbur said deliberate indifference and they just misread it. I mean, the Fifth Circuit got it right. So if you're going to rule against us, at least wipe the slate clean and say, they want to say you have to follow Title VI because they don't make difference in terms of parties and you have to use intent for damages. Then intent for damages should be intent to discriminate just like Title VI. And we do think there is no textual basis. They erased a lot of policy stuff between an injunction and damages. But federal funding is now a big deal. They could say one good faith disagreement with the IDA is enough to cut off all the school district's funding just because they disagreed. Or actually, no, they could have just got it wrong. Their view is all funding in any school, even Harvard, any school, the entire funding be cut off because they didn't fix the elevator long enough. Like the elevator was there but it was broken for two months or two weeks. Failure to reasonably accommodate liability. And now federal funding is a big deal. No government has ever threatened the loss of federal funding based on the Rehab Act. But you don't need anti-Semitism anymore or encampments. You can just say you violated the reasonable accommodation. Now this is a big deal is what Justice Barrett is saying. So I understand that you don't want to take on this case. But I didn't bring this petition. This petition said decide the standard. And then decided your article, Justice Kavanaugh, saying you look at the plain text. So I can't be faulted by what Judge Arnold did and pick up the text and it says solely by reason of discrimination. Ms. Blatt, I think we have to really be fair about what the question presented in this case actually is. It did not say decide the standard. I'm reading. The question presented is whether the ABA and Rehabilitation Act required children with disabilities to satisfy a uniquely stringent bad faith or gross misjudgment standard when seeking relief for discrimination relating to their education. That can have two meanings. One, you could put all the emphasis on uniquely stringent. Should this court adopt a uniquely stringent standard when it's called bad faith? Or it could mean what we think the end of the petition said it meant. Should a court adopt the bad faith standard which is uniquely stringent? And the last line of their petition says you should decide what standard applies in this case. Now, if you want to read it as the should courts adopt uniquely stringent standards, then you're right. The parties agree. And you're saying that's not the way you read it when I'm looking at page 27 of your bio which says the bad faith or gross misjudgment standard is an appropriate exercise of discretion. And most importantly, it accounts for the unique nature of claims like petitioners, that is, claims by students with disabilities regarding the appropriateness of their IEPs. And you go on at length in talking about the unique nature of this particular context and why it would justify having this standard as opposed to the standard that all the courts have applied in other contexts. Well, that's why page 26 precedes page 27, which I think you're reading from. And page 26 says the court of appeals decision below is correct. And it's correct because of the text. It's correct because it incorporates Title VI. And it's correct because it's been definitively interpreted in Alexander v. Sandoval, which is a pretty big deal for the uniquely worded Title VI case. But, Justice Jackson, there's no disagreement that we've always said that there's a big problem with the other side's argument in the school context because every IDEA disagreement now risks the loss of federal funding and injunctive relief. And so, yeah, that is a big deal. And in terms of damages, that's a big deal, too, if you have a deliberate indifference standard, which, to be fair to us, does not apply in any other context. So there's no question that there's an incoherent big mess of a regime because this court started out in Davis saying that this is not an affirmative action case. And then you had Choate, which is maybe not Exhibit A, but it's Exhibit B for what this court has called the battle days. And that case has a lot of dicta that talks about reasonable accommodation. Monaghan was decided after Davis, before Choate. Can I just focus your attention on that? Because I don't understand why you are really pressing this idea that discrimination claims in the context of reasonable accommodations and disability aren't something unique. I mean, I thought the Alexander versus Choate line of thinking was that you can have discrimination in this context, say, differently from maybe racial discrimination or gender discrimination, when an entity that is responsible for accommodating someone with a disability doesn't act. That you have benign neglect, meaning you're not doing it out of some sort of intent to treat this person differently. In fact, what you say is, I'm treating this person the same, and the same is a world in which they can't walk up the stairs and they can't see the board and they can't do the things that everybody else can do. In the discrimination of disability context, the requirement of the law is to treat them differently. Differently in the sense that you're accommodating them so that they can take and have full enjoyment of the services. So it's just a different concept. With respect, that's not the statute Congress passed. And if you just look at Title I and Title III, they have oodles and oodles of explanation of what a reasonable accommodation is, multi-part definitions. No, but the whole idea of accommodation is unique. That's not in the statute. Accommodation is not in the statute? 504 and Title II, no. That's what this, I mean, no. It's not in the ADA. It sure as heck is not in the statute. The word reasonable is not in the statute. The word accommodation is not in the statute. This passive voice reading has got to be incorrect because it would bring all disparate claims under. You said that you read disability discrimination statutes to not be requiring accommodation for people with disabilities. That it's just about discriminatory intent, meaning not treating these people the same as everyone else. Correct, and that is glaringly obvious when you look at this seminal statute of the ADA because Title I for employers, Title III for country clubs and hot dog stands have not only reasonable accommodations provisions, Justice Jackson, but they don't make hot dog stands liable for damages, and a made-up judicial damage remedy comes from thin air. Ms. Platt, the answer to this is probably clear since you called the two-tier test stupid, but I just want to clarify. You agree there's no two-tier test? Correct. Okay, so there is what Justice Gorsuch has sometimes called radical agreement on that point.  Okay. There's radical agreement. What there's radical disagreement on is the question presented. And if you just say, and I know it's sometimes easier for you to say we don't have to do a lot, but you cause real harm to the parties who don't have Supreme Court counsel and lower courts who get confused when you just remand and say we just remand. So if you could at least set the slate free, well, it's part of your job, Justice Kavanaugh, to set the law sometimes. And I understand it's easier for you and you have a lot going on not to set the law. Ms. Platt, I confess I'm still troubled by your suggestion that your friends on the other side have lied. Okay, let's pull it away. I think we're going to have to here, and I'd ask you to reconsider that phrase. An oral argument. If I might. It was incorrect. Incorrect is fine. People make mistakes. You can accuse people of being incorrect, but lying, Ms. Platt, if I might finish. Sure. Lying is another matter. Page one of your brief in opposition. Yep. As applied to the provision of IDEA services, the overlap between these statutes leads to a conceptual particularity that exists only in this context. Yep. That seems to suggest you're arguing for a unique rule. Page two. For more than 40 years, courts of appeals, considering this unique subset of ADA and rehabilitation claims, directly challenging IDEA's educational services have widely recognized that plaintiffs must establish more.  That scheme requires plaintiffs to show that school professionals acted with discriminatory intent by demonstrating that the decisions were premised on bad faith or gross judgment. Page three. In this unique context, courts must balance the Rehabilitation Act and ADA's prohibition on disability discrimination with educators' responsibility for determining appropriate special education services. The bad faith or gross misjudgment standard properly accounts for the need for deference. Page 27. As courts have recognized discrimination claims based on an IEP's adequacy or a conceptual peculiarity that exists in the primary and secondary educational context, further down, the bad faith or gross misjudgment standard permits the courts to adjudicate these novel claims without requiring judges to substitute their own notions of sound educational policy for those of school authorities. Correct. One could interpret those perhaps different ways, but surely a reasonable person could interpret them as arguing for a special rule in the educational context, correct? No, only because of the text. Ms. Flatt. A reasonable person. All of those emphasize the unique context of primary and secondary education and the need for a special rule, don't they?  But what I'm- Fine. Fine. Then would you withdraw your accusation? I'll withdraw it. Thank you. That's it. Also, going back to a question Justice Barrett asked, you are basically saying, no, I'm not asking for a unique rule. I'm asking for a rule that applies in all discrimination statutes. But nowhere else have I seen the use of deliberate indifference or gross indifference used to define intentional discrimination. In fact, in Albuquerque, we had a neutral policy that applied to all employees. They can't wear headgear. And we said a neutral policy can still discriminate against religion even though there was no bad faith proven there. It was all hats are out. All coverings are out. Correct. So I don't know where the bad faith comes from. I am not even sure deliberate indifference comes from. But putting that aside, before we rule in a way that suggests that your new definition applies to every statute, that this is the way we now define intentional for every statute, shouldn't we have had that fully aired below? Well- And accurately aired. So if you just interpret bad faith the way we think Judge Arnold did and the way we do it as improper purpose with only disability, then it's nothing new. It's just a prohibited reason, just like in the racial gerrymandering. But that is gerrymandering, the definition, because if it's a neutral policy in terms of what you wear can still discriminate. Yes. So we are in complete agreement that if you have a policy to cancel all field trips and the reason is because you don't want to make accommodations for the disabled, then that is bad faith or that's an intent to discriminate. We are fine with the statutory language solely or take out the solely by reason of disability. There was no evidence that they passed this because they wanted to discriminate against religious people. They passed their dress code because they wanted a particular look in their store. It wasn't until this individual came in and said my religion requires this that they said I'm not going to reasonably accommodate you. They didn't pass the policy with anti-religion animus. Let me just give you another example. When you're using the words bad faith, you're talking about animus. No. You're in charge so you can say intent to discriminate is the standard. We're not going to use bad faith. We don't like that word. Intent to discriminate. If you say bad faith, please make clear that it only means intent to discriminate because you could violate the IDA just because you think disabled children are better off without the accommodation. That is a violation of the ADA and the Rehab Act. That is discrimination. It's not animus. It could be benign intent. Basically, it's the same standard in the race context or in the sex context. No one cares what your views are towards women or people of color if you treat them differently. You can't do that. Counsel, it would have been nice to have known that we were biting off that big a chunk. I agree. But in terms of what we had to do when you granted cert was look at the text and then the blue brief said that there is no intent required. They cited the definition of what a qualified individual was and said By the way, intent's not even an issue here because there wasn't an injunction being or the lack of an injunction challenged here. They got the injunction under the IDEA, didn't they? They want more. Well, we can put aside whether they want more. But the only thing before us on the decision below is whether it's an intent standard or a heightened standard. I think that's fair because it's a summary judgment standard, so that's the way I would put it. If I were you, I'd say, y'all, you have to decide a summary judgment. And our point on the damages is part of their whole shtick is that this statute incorporates Title VI. And they say, and that requires intent. And so we are saying, and again, back to defense of the red brief, when both the gray brief and the blue brief say that no intent is required under the statute, we said that's wrong. Well, I mean, I'm sorry. Go ahead. I was going to say the choice is not one standard or another. I would have thought from the framing of the whole case, the question was whether you have a different standard in the educational context. And if that is, and I agree, if that is the way you define the question presented, then the parties are in radical agreement. If, as we read in the last statement of their petition, said you should resolve the standard. If you don't want to resolve the standard, then you're correct. There's not much to decide. But you are overturning, in effect, the law of five circuits that affects 46,000 schools. And there are 8 million kids that are covered by the IDA, and there are 30,000 of these complaints. And their view is every IDA violation is a violation of the statute. Now, they say there may have been another violation, but that is the theory. And in terms of the unique context, what Monaghan says is if you violate a free and appropriate education, that's just not necessarily discriminatory. It could be based on budgets. It could be based on you just disagreed what the accommodation was, as was the case here. And the court in Monaghan said you need to show discriminatory intent, and it used the phrase bad faith, meaning the improper purpose. But I agree. If you read this like Ames, where there was no defense of decision below, then you don't have a lot to do. But we're here radically defending the decision below, which we've done in the rehearing petition and in the brief in opposition and in the red brief. If you don't think that you might have violated Rule 15.2 of our rules, that requires counsel of its obligation, quote, respondents to address any perceived misstatement of fact or law in the petition that bears on what issues probably would be before the court if certiorari were granted, Where in this brief do you say Monaghan is consistent outside the unique education?  So let's just be clear. We did not say the implications of our textual defense means Monaghan or a intent standard would be required outside. What we took as given and why I don't think the rules were violated is that all the courts have said in this asymmetrical world, following the regulations and chote, that there is a no intent requirement for reasonable accommodations, although an intent requirement for disparate impact, Judge Sutton's opinion. And then all the circuits but the Fifth Circuit have said there's deliberate indifference or intent because of the Title VI incorporation. What we did not point out in the orange brief, which is correct, that that regime doesn't make any sense. So that's right. We didn't point that out because it was only when, you know, we're here briefing on the merits. And I think you would want respondents counsel to defend the decision below. The decision below is based on the text. So we started with the text. And what I think the other side. Where do you think that the petitioner says that a violation of the IDEA necessarily constitutes a violation of the ADA? It's JA 20 and 24, paragraphs 118 and 133. So it's not in the brief. It's in the complaint. I would just say it's not. I'm sorry. Paragraph 118. And 133. Now, paragraphs 119 and 134 say the ADA and the Rehab Act were violated other ways. But part of their complaint is just the violation of the IDEA. It just says the violation of the IDEA itself is a violation of the other statutes. And we would hope that you would clear that up. But that can't possibly be right because the IDEA can go way beyond what might be a reasonable accommodation. And I also think it's not clear from their brief on deliberate indifference. Deliberate indifference as to what's statutorily protected right, either the reasonable accommodation right or the IDEA. And I think, in fairness to them, it's both. Thank you, counsel. Justice Thomas? Justice Alito? Well, I won't have another opportunity to question Mr. Martinez, so perhaps he could address that in rebuttal if he sees fit, whether he is arguing that a violation of the IDEA necessarily constitutes a violation of the ADA. What the complaint says is that the district's violations of the IDEA also violated plaintiff's rights under Section 504 of the Rehabilitation Act and says the same thing about the ADA. Yes. And, again, it's important to school districts that you make clear, if you can level set, that the mere bare violation, because that is the thrust of Monaghan, is that a bare violation does not necessarily violate the statute. Thank you. Justice O'Meara? Justice Kagan? Justice Kavanaugh? You say the statute requires intentional discrimination, Title II, and the Rehabilitation Act. The Solicitor General says, yes, that's right, deliberate indifference is an intent standard. Do you want to respond to that? Deliberate indifference is not an intent standard for discrimination. It can be an intent standard in the prison context. If you know someone is dying and you don't do anything, that means you intentionally acted. But you could intentionally act. Deliberate indifference can be evidence of discriminatory intent. But just because you deliberately don't respond to a parent's complaints doesn't necessarily mean you intend to discriminate on the basis of disability. Well, right. And I think the way the Solicitor General then defines deliberate indifference is why at least I see the delta here is pretty small, because they say you have to know that you're violating your legal obligations or what's substantially likely to be your legal obligations. That's really... But then they said that you don't have to know the law. So in other words, if a parent says, high school, you're violating your legal obligations. That is true. They did say you have to know your legal obligations. They said you didn't. Maybe I misheard them. I heard them say you don't need to know the law, and I know that's what my friend for the petitioner said. You don't need to know the law. I don't know how you can know. This is a helpful question, by the way. I don't know how you can know that a federally protected right was substantially likely to be violated without having some idea what the law provides. Well, we would welcome that if you're going to have a deliberate indifference standard, that they be as high as possible. Because if you have these, again, what the school districts are worried about is because you have good faith disagreements and all. I mean, these are really tough cases in terms of, you know, how much support. Here, she had ten specialists. So these are just tough cases. And so the question was how much support she should be given at home. I guess what I'm getting at is deliberate indifference can be fairly protective, as defined by the Solicitor General, fairly protective of school districts in the sense that the law is not like you open a code book and it tells you, oh, go to 6 p.m. You have to decide what's reasonable. If you would define it that way, that would be great. I mean, we would appreciate that. Although we do think if you're going to incorporate Title VI, I mean, you're now just saying the Fifth Circuit is wrong. The Fifth Circuit said, oh, I don't know, Sandoval looks like it says intent. It doesn't say deliberate indifference. And these are all spending clause statutes. So Title IX, Title VI, the Rehab Act, the Affordable Care Act incorporates all these. And this is a one area, and Justice Barrett is correct, this is a big, messy area. So I don't blame you for not wanting to get into it. But we would at least appreciate that you make clear that there's a level set, particularly on damages. Thank you. Justice Barrett? I just am still struggling with how you account for the language in the disability discrimination statutes that goes beyond discrimination and discriminatory intent. And so I'm looking, for example, at the Title II language, which says no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by such entity. And my understanding of the way at least that courts have been interpreting this is you don't need discriminatory intent in a situation in which a person is alleging, for example, that they have been excluded from the participation. And you seem to be suggesting that you still have to have that element in some way. And I'm confused by this. Sure. And you have to start from the fact of what is Congress's authority to even pass Title II. It's not a Commerce Clause legislation. Well, it's important because it looks like it's Section V. So you have to see it through the lens of Congress's power under Section V. But even putting that aside, if you don't read it, if you just look at Titles I and Title III, where they spell out disparate impact, and so if you read that statute in the passive voice to require disparate impact, all the disparate impact and reasonable accommodation provisions and definitions and contours are all superfluous. I actually think this case is easier under Title II because you don't have the chote baggage. But if you just look at Title II, it's an easy case that there is no reasonable accommodation requirement at all. That's our stronger cases under Title II because Titles I and Title III are so chock full of the contours, and there's no reasonable requirement in II. So it's made up. It doesn't say you have to reasonably accommodate. On the other side, they say the definition is remove structural communications, transportation barriers, and auxiliary aids. But there's no word reasonable in there, so it has to be read in when it's actually defined in great details in I and III, what it means to modify the program, what an undue hardship is a four-part test, and what is readily achievable as a four-part test. Thank you. Thank you, Counsel. Rebuttal, Mr. Martinez? Your Honors, I'm not going to dignify Ms. Blatt's name-calling here with a response in kind, but I appreciate that she withdrew the charges here, although perhaps a bit under duress. I do want to address whether we were incorrect in characterizing her position, and the answer is absolutely not. You heard her say today that she was radically defending the Eighth Circuit's decision in this case. Well, that decision includes Footnote II, which expressly characterized Monahan as applying a higher test, a two-tiered test. So if she's radically defending that, then she's radically defending the two-tiered approach that I think she said was completely wrong. We would also encourage you to look at page 23, in addition to all the other pages that were cited, where she said that the universe of plaintiffs with claims affected by the question presented is narrow. For educational discrimination plaintiffs not covered by the IDEA, such as college students, a bad faith or gross misjudgment standard does not apply. That's exactly the opposite of what she's saying now. So what is at issue in this case? I think the most important thing we heard from Ms. Blatt is when she conceded in questioning from Justice Jackson that she is trying and the district arguments here are trying to get rid of the reasonable accommodation claims that people in this country with disabilities have enjoyed for decades. That's what's at stake. This is a revolutionary and radical argument that has not been made in this court and that she's trying to get you to decide on the basis of essentially no briefing. The question of whether reasonable accommodations are required is easy. There are subsidiary questions that are challenging. You should not address those subsidiary questions in this case because we haven't had briefing. It's unfair to you. You don't have a decision below. It's unfair to us. It's unfair to our amici, the disability rights community, who would have rung a five-alarm fire if they had known that reasonable accommodation claims were on the table. So you should not address that. You should apply your waiver rules. If you do address some of this stuff, Justice Kavanaugh, I would encourage you to look at the COPA amicus brief on pages 18 to 29. It has a very good discussion of the kinds of cases and where the different standards might make a difference. I think on the merits, the most important point Ms. Blatt made was this assertion, which I would characterize as incorrect in the extreme, that the ADA does not talk about or somehow ratify reasonable accommodation claims. I would appoint the Court, most importantly, to Section 12201A, in which the ADA Title II expressly incorporates by reference the regulations that had been enacted under the Rehabilitation Act, all of which expressly embrace reasonable accommodation claims. In addition to that, I would appoint the Court to other provisions of the ADA, 12101A5, 121312, 12201H. All of those refer to either reasonable accommodations or reasonable modifications. So with respect, I think that's wrong. Finally, let me just take a step back, Your Honors, and talk about really what's at issue in this case. This case started narrow. It was about a sliver of plaintiffs. It's now quite broad because of the arguments the district is making. If you accept her arguments, think of all the people who are going to be affected. Think of five-year-old Elena Frye with cerebral palsy who needs the help of her service dog, Wonder. Think about George Lane, the Tennessee man forced to crawl up two flights of stairs in order to have his day in court. Think about Ava, who desperately needs every precious hour of school so she can learn to communicate with her parents. We ask you to reject those radical arguments, and we ask you to vacate the decision below. Thank you, Counsel. The case is submitted.